[926 NYS2d 53]

Elissavet Gogos et al., Respondents, v Modell's Sporting Goods, Inc., Appellant.

First Department, June 23, 2011

## APPEARANCES OF COUNSEL

*Baker Greenspan & Bernstein*, Bellmore (*Lisa M. Browne* of counsel), for appellant.

*Steven C. Rauchberg, P.C.*, New York City (*Steven C. Rauchberg* of counsel), for respondents.

## OPINION OF THE COURT

Tom, J.P.

The issue raised on this appeal is whether Supreme Court appropriately directed a negative inference charge be given against

defendant at trial, for alleged spoliation of evidence, under the circumstances of this case.

The complaint alleges that, on September 16, 2006, Elissavet Gogos fell on the second floor of defendant's store due to a slippery condition on the tile floor located near a row of four cash registers. Upon defendant's failure to respond to plaintiffs' December 10, 2007 demand for copies of all relevant surveillance videos (CPLR 3101 [i]), plaintiffs obtained a court order in January 2008 directing production of the videotapes within 30 days. Defendants failed to comply. During an August 26, 2008 deposition, defendant's general manager testified that the videotape for the date of the accident was placed in a safe in the store. However, the vice-president of defendant's subsidiary, Modell's II, thereafter submitted an affidavit, dated April 13, 2009, stating that defendant no longer retained the tapes and that "[n]o videotapes were created . . . by [defendant] that would depict this area of the store or the plaintiff's accident."

█ The motion court properly exercised its discretion in granting plaintiffs' motion, which sought to strike the answer for spoliation of evidence, to the extent of directing that an adverse inference charge be given against defendant at trial (CPLR 3126).* In finding that "no adverse inference charge is warranted," the dissent misses two essential points: that violation of a court order is subject to sanction and that the adverse inference, if any, to be drawn against defendant for failure to produce evidence, as directed by the order, is a question for the trier of fact, not the court.

Defendant was put on notice to preserve and produce the surveillance tapes, both by plaintiffs' notice to produce and by the ensuing court order. The subsequent destruction of the tapes was a direct violation of the mandate of the court and deprived plaintiffs of the opportunity to view possible material evidence. To adopt the dissent's position would invite parties to destroy trial evidence—and permit them to ignore court orders with impunity—merely by employing the expedient of claiming that the evidence is immaterial and unnecessary (CPLR 3101 [a]).

---

* The dissent mistakenly asserts that all reasonable inferences must be drawn in favor of defendant, which is the standard to be applied in favor of plaintiff upon a motion to dismiss the complaint (CPLR 3211 [a] [7]; *Sanders v Winship*, 57 NY2d 391, 394 [1982]). Rather, the sanction for failure to comply with a discovery order, as in the present case, is entrusted to the court's discretion (*see Couri v Siebert*, 48 AD3d 370 [2008]).

Plaintiffs were entitled to inspect the tapes to determine for themselves whether the area of the accident was depicted. They should not be compelled to accept defendant's self-serving statement concerning the contents of the destroyed tapes, particularly in view of the conflicting evidence in this case. Though "not 100 percent sure," defendant's manager testified that the area of plaintiff Elissavet's accident was within view of the surveillance cameras. Without the video recording, plaintiffs may be unable to establish that defendant had the requisite notice of the piece of mango on the floor that is alleged to have caused the fall (*see Minaya v Duane Reade Intl., Inc.*, 66 AD3d 402, 403 [2009]).

The dissent, in an attempt to find support for defendant's position that the surveillance tape made on any particular day is effectively destroyed in the ordinary case by being reused 30 days later and, thus, the tapes were destroyed long before the court order was issued, has completely distorted the record. During his examination before trial on August 26, 2008, defendant's general manager, Cesar Abreu, responded to a question concerning defendant's surveillance system, particularly, under normal circumstances, how long a computer file is kept. Abreu answered, "Basically it's a basic program that runs for 30 days it keeps it on file." However, it is clear from the totality of Abreu's testimony that the procedures for compiling and retaining videotapes on uneventful days differed from the procedures on those days when there were accidents on the premises involving patrons. The dissent seizes on Abreu's general response and completely disregards his detailed and specific testimony concerning the compilation and storage of the videotapes of Elissavet's accident to conclude that they had been routinely destroyed. In fact, Abreu testified as to the retention of the subject videotapes as follows:

"Q: Did anyone ask you for a copy of the videotapes that day?

"A: You just make sure you keep it inside a safe.

"Q: There's a safe?

"A: Inside the office.

"Q: Is the camera—the views that we're talking about the video—

"A: It's kept for that day.

"Q: That's put on a CD or any type of storage device?

"A: Or a videotape, we keep the video for that day.

"Q: Was that done for this incident?

"A: Yes."

It is significant that Abreu was deposed more than six months *after* the court had issued the order directing production of the tapes. According to his testimony, defendant was in possession of the tapes at the time of his deposition. When asked where that video was, he responded succinctly, "It has to be back in the store." Plaintiffs' counsel then demanded a copy of the video. Had the tapes already been destroyed at that time, counsel for defendant could have so stated on the record. Instead, he told plaintiffs' counsel to "serve a demand and I'll have to make a search." Nowhere in Abreu's deposition does he state that the videotapes taken on the day of the accident were destroyed. It is only in the affidavit of Michael Feeley, "current" vice-president of Modell's II, a subsidiary of defendant, submitted by defendant 16 months *after* the court ordered the production of the tapes, that the self-serving statement that no videotapes were created by defendant appears.

In its tortuous reasoning that the tapes were destroyed before the court issued the order directing their production, the dissent not only distorts the unambiguous testimony of defendant's own store manager, who has personal knowledge of the facts, but also conveniently disregards the applicable case law concerning the submission of defective, belated and contradictory affidavits in response to a dispositive motion.

The dissent refers extensively to a second affidavit by Michael Feeley, dated August 31, 2009, submitted in opposition to plaintiffs' motion dated July 8, 2009, to strike defendant's answer for failure to preserve evidence. This affidavit, which was submitted 20 months after the court ordered defendant to produce the tapes and approximately 36 months after the accident, states, inter alia, "Each tape would be recycled and taped over on a constant thirty day basis. It appears that this is what happened to the videotapes from the store on the date of the plaintiff's accident." This affidavit completely contradicts the deposition testimony of defendant's store manager, Cesar Abreu, who testified more than a year earlier that a videotape was made on the day of the accident and was kept in a safe in the office of the store. Abreu also testified at his deposition,

taken six months after the court order had issued, that the tapes made at that time were in the store. Despite the glaring inconsistencies between Feeley's testimony and that of manager Abreu, the dissent continues to argue, by selective reading of Abreu's testimony, that Feeley's testimony is not inconsistent with that of Abreu, an indefensible position.

The Feeley affidavit is nothing more than a last-minute attempt by defendant to tailor the facts and present a feigned factual issue to avoid the consequences of the admission by manager Abreu, six months after the court order was issued, that the subject tapes were retained on defendant's premises, and is, thus, without probative value (*Capraro v Staten Is. Univ. Hosp.*, 245 AD2d 256, 257 [1997]). Further, a self-serving affidavit by the vice-president of a subsidiary of defendant offered to contradict the deposition testimony—here, the testimony of defendant's own general manager—or to retract a previous admission does not raise a bona fide issue of fact and will be disregarded (*see Lupinsky v Windham Constr. Corp.*, 293 AD2d 317, 318 [2002]).

It appears that Feeley was not the vice-president of defendant's Modell's II subsidiary at the time of plaintiff's accident, nor did he work at the premises where the accident occurred. On the other hand, Cesar Abreu was defendant's general manager at the subject store, interviewed the injured plaintiff immediately after the accident, called an ambulance for her, investigated the accident, and prepared the accident report. As opposed to Feeley, Abreu is a witness with actual personal knowledge of the facts, and he testified as to how the videotapes on the date of the accident were prepared and retained by defendant.

■ The affidavit by Michael Feeley is deficient. Throughout its writing, the dissent at times refers to Feeley as "defendant's vice-president," a misidentification conveying the false and misleading impression that Feeley was employed in a capacity giving him personal knowledge of the facts of this case. Once again, Michael Feeley is not the vice-president or even an employee of defendant corporation. In both of his affidavits, he avers that he is the current "Vice President of Modell's II, Inc., a subsidiary of [defendant corporation]." Nowhere in his affidavits does he state whether there was any operational connection between Modell's II and defendant corporation, two separate and distinct entities, a fact that the dissent does not want to acknowledge. In any event, the dissent misses the point. Fee-

ley, who is not an employee of defendant corporation, makes the conclusory allegation that he is "fully familiar with the operations of this store, including the surveillance cameras located in certain parts of the store," without any explanation of the source of his knowledge (see Peacock v Kalikow, 239 AD2d 188, 190 [1997]). He does not state the nature of his duties, if any, with respect to defendant, a corporation he apparently has no connection with, so as to shed light on the manner in which he allegedly obtained knowledge of the facts of this case. Thus, his affidavit is without probative value (id.). This Court is empowered to decide, sua sponte, that an affiant is without personal knowledge of the facts in a case by simply reviewing the substance of the affidavit (see e.g. Adam v Cutner & Rathkopf, 238 AD2d 234, 238 [1997]). We are not required to accept Feeley's testimony as competent evidence merely because he "swore to the fact," as the dissent urges. It is the burden of the proponent of an affidavit to demonstrate the basis of the affiant's knowledge (see id. at 239-240), and here, defendant failed to meet that burden. It appears that the dissent is placing the burden of proof on the wrong party when it states that "[p]laintiffs' counsel offered no factual basis for his assertion that the vice-president had no personal knowledge of the facts." It further appears that the dissent is advancing a legal concept that anyone remotely related to a party to an action can claim to have personal knowledge of the facts of the internal workings of that party by merely reciting, without more, his or her remote connection to that party. That is not the law. Thus, the dissent's conclusion that Feeley has personal knowledge of the facts based solely on Feeley's statement that he is the current vice-president of defendant's subsidiary corporation is without factual or legal basis and must be rejected as untenable.

The dissent is incorrect when it states that "at no time have plaintiffs ever argued that the vice-president's position as an officer of the subsidiary was at all relevant, let alone that it provided a ground for disregarding his affidavit." In the reply affirmation dated September 10, 2009, plaintiffs' attorney stated that "the Court should not be misled by the improper self-serving and speculative affidavits from defendant's two off-site executives with no personal knowledge of the facts." Because the dissent's arguments are premised on the self-serving statements by Michael Feeley, its entire position falls along with the affidavits, which lack merit and probative value.

■ Under the circumstances, the motion court properly directed that an adverse inference charge be given against de-

fendant at trial. It is not the function of this Court to micromanage discovery proceedings in the trial parts, particularly where, as here, the remedy for nondisclosure is entrusted to the discretion of the motion court (CPLR 3126), and the order issued was well within the province of the court's discretion. Here, the dissent unnecessarily intrudes upon the discretion of the trial court to control its pretrial discovery calendar.

The dissent's reliance on *Marcano v Calvary Hosp., Inc.* (13 AD3d 109 [2004]) in support of its position is misplaced. There, the defendant similarly erased a videotape, alleging that the security camera did not film any of the plaintiff's accident. However, the motion court sua sponte sanctioned the defendant by precluding it from offering evidence at trial regarding the manner in which the plaintiff's accident occurred. This Court reversed on the ground that it is for the jury to determine whether the defendant's employee was credible when he testified that the videotape was erased because the camera did not cover the area of the plaintiff's accident and, if not, to determine the inference to be drawn.

Here, the motion court directed that the trial court "shall issue a negative inference charge" against defendant. A reading of the adverse inference charge simply shows that it is permissive (*Baez v City of New York*, 278 AD2d 83, 84 [2000]), and conflicting inferences as to whether a video surveillance camera recorded the incident are appropriately deferred for resolution by a jury upon suitable instruction. As noted in *Marcano*, the charge provides that the jury shall determine whether there was a reasonable explanation for the destruction of evidence and, if not, the inference to be drawn from its destruction (*see* PJI 1:77.1; *Tawedros v St. Vincent's Hosp. of N.Y.*, 281 AD2d 184 [2001]).

We note that in *Marcano*, in further contrast to the instant matter, it appears that no court order directing the defendant to produce the tape had been issued prior to its destruction.

The sanction herein was "appropriately tailored to achieve a fair result" (*Balaskonis v HRH Constr. Corp.*, 1 AD3d 120, 121 [2003] [internal quotation marks and citation omitted]). Defendant will not be able to use the absence of the videotape to its advantage (*Minaya v Duane Reade Intl., Inc.*, 66 AD3d 402, 403 [2009], *supra*).

Accordingly, the order of the Supreme Court, New York County (Carol R. Edmead, J.), entered on or about November 2, 2009, which granted plaintiffs' motion to strike defendant's

answer on the ground of spoliation of evidence to the extent of directing that an adverse inference charge be given to the jury, should be affirmed, without costs.

McGUIRE, J. (dissenting). I dissent. The motion court granted the motion "to the extent that plaintiff is entitled to a negative inference charge at trial with respect to what was on the subject videotape. The Trial Court shall issue a negative inference charge at trial regarding what was on the videotape." Like the motion court, the majority improperly resolves disputed and critical issues of fact against the party opposing the motion.

The order directing that an adverse inference be charged assumes that the area in the store where plaintiff Elissavet Gogos fell was covered by a video camera. At his deposition, defendant's manager answered "[n]o" when asked if "[t]he area where she said she fell, is that covered by a video?" On the other hand, asked essentially the same question shortly thereafter ("The area where [plaintiff] said that she fell, is that within the view of the surveillance tapes that you viewed?"), the manager responded, "Yes, you could see there because there's a thing right there, yes." Just before his last answer, however, the manager was asked, "The spot that she said that she fell, is that a spot where the surveillance cameras would see someone?" He answered, "To be honest with you I'm not 100 percent sure on that."

Ostensibly in support of the motion to strike the answer, plaintiffs submitted the affidavit of defendant's vice-president,[1] who swore that there were no "surveillance cameras[ ] which were focused on the area at or near the top of the escalator on the second floor. No video tapes were created or retained by [defendant] that would depict this area of the store or the plaintiff's accident." Although the vice-president's affidavit may not be a model of clarity, a fair reading of it is that the area where plaintiff fell was not covered by any video camera.

---

1. Although the vice-president is the vice-president of a subsidiary of defendant, largely for the sake of convenience I will refer to him sometimes as Modell's vice-president. I note, too, that plaintiffs also sometimes so refer to him. Nonetheless, the majority writes that my occasional references to him as Modell's vice-president are a "misidentification conveying [a] false and misleading impression." Presumably, the majority does not approve of defendant's identical references to the vice-president. Oddly, the majority writes that the separate and distinct status of the two entities is "a fact that the dissent does not want to acknowledge." Why the majority makes this statement is unexplained. The statement is all the odder because, as discussed below, plaintiffs make no argument based on the fact that he is a vice-president of the subsidiary.

In any event, no adverse inference charge is warranted because Modell's at the very least asserted facts that, if true, would establish that it did nothing wrong in "destroying" the videotape.[2] After all, absent notice to Modell's that plaintiffs intended to commence litigation, Modell's was free to "destroy" the videotape (see Greater N.Y. Mut. Ins. Co. v Curbeon, 300 AD2d 182 [2002]; Conderman v Rochester Gas & Elec. Corp., 262 AD2d 1068, 1070 [1999] ["In the absence of pending litigation or notice of a specific claim, a defendant should not be sanctioned for discarding items in good faith and pursuant to its normal business practices"]).

In another affidavit, submitted in opposition to the motion to strike the answer, the vice-president again swore that no surveillance camera focused on the area where plaintiff fell. More importantly, he swore as well that "Modell's did not learn of a claim or lawsuit by the plaintiff for at least six (6) months following this incident." Additionally, he stated:

"Moreover, I wish to advise the Court that even if a videotape did exist depicting the plaintiff's accident, that videotape was not destroyed or discarded intentionally by Modell's. At the time, Modell's recycled its videotapes on a monthly basis. In other words, there were approximately thirty videotapes in the store at the time. One tape would be used for each day. At the end of each day, the tape would be placed aside for a thirty day time period until each of the other tapes were then used. Each tape would be recycled and taped over on a constant thirty day basis. It appears that this is what happened to the videotapes from the store on the date of the plaintiff's accident. Again, this was just Modell's normal procedure. The tape was not intentionally destroyed in order to avoid providing evidence in this action."[3]

---

2. For some reason it does not even mention, the majority writes that "[t]o adopt the dissent's position would invite parties to destroy trial evidence . . . merely by employing the expedient of claiming that the evidence is immaterial and unnecessary." Of course, however, no such invitation can be found in my position, which rests solely on the contention that Modell's asserted facts that, if true, would establish that it did nothing wrong in "destroying" the videotape.

3. Curiously, the vice-president also stated that he "realized that [the manager] testified that he believed that he reviewed a surveillance tape of the plaintiff's accident." In fact, the manager did not so testify. Rather, he testified only that he reviewed videotape "with regard to that incident," not that

Finally, the last paragraph of the affidavit expressly stated what was implicit in the paragraph quoted above: "I wish to stress to the Court that the tape was recycled within thirty days of the accident and was not discarded intentionally."

Accordingly, this case is indistinguishable from *Marcano v Calvary Hosp., Inc.* (13 AD3d 109 [2004]), in which the plaintiff moved to sanction the defendant for destroying a surveillance tape of the area where he had fallen from a lift at the defendant's loading dock. An employee of the defendant testified that the security camera monitoring the loading dock had captured " 'some of' " the incident (*id.* at 110). This employee subsequently submitted an affidavit changing this deposition testimony to a denial that the security camera would have filmed any portion of the plaintiff's fall, asserting that he had "incorrectly testified" (*id.*). As we held in reversing the trial court's order granting a motion to sanction the defendant for alleged spoliation, "It is for the jury to determine, after being appropriately instructed, whether [the witness's] correction of his testimony (which does not appear to be patently false) is credible, and, if the correction is found not credible, to determine the inferences to be drawn from that finding" (*id.* at 111).

A linchpin in the majority's argument is the following two sentences:

> "Defendant was put on notice to preserve and produce the surveillance tapes, both by plaintiffs' notice to produce and by the ensuing court order. The subsequent destruction of the tapes was a direct violation of the mandate of the court and deprived plaintiffs of the opportunity to view possible material evidence." As discussed above, however, defendant's vice-president swore both that the surveillance tape made on any particular day is effectively destroyed in the ordinary case by being reused 30 days later and that the videotape at issue was recycled within 30 days of plaintiff's fall.[4] For some reason it does not explain, the majority apparently

he reviewed tape of the actual fall. In any event, the vice-president immediately went on to swear that the manager "is mistaken and must be thinking about some other accident which occurred at a subsequent time or in a different location in the store."

4. Nonetheless, after quoting this sentence, the majority writes that it is a "complete[ ] distort[ion]" of the record.

believes that all reasonable inferences should be drawn against the party opposing the motion—defendant—and that all evidence supporting defendant's position should be disregarded. The majority thus gets it backwards, since the law unambiguously places the burden on plaintiffs to show that Modell's improperly destroyed the videotape (*see Robertson v New York City Hous. Auth.*, 58 AD3d 535, 536 [2009]; *Kirschen v Marino*, 16 AD3d 555, 555-556 [2005]; *cf. Leon v Martinez*, 84 NY2d 83, 87 [1994] [in context of CPLR 3211 motion to dismiss, we "accord plaintiffs the benefit of every possible favorable inference"]; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3212:17, at 27 ["The court will accept as true on a summary judgment motion the opposing party's evidence and any evidence of the movant that favors the opposing party"]).[5] Accordingly, because plaintiffs have not met their burden of showing that the tapes were "destroyed" long before the court order was issued, the adverse inference instruction cannot be defended on the ground that the recycling of the videotape was "a direct violation of the mandate of the court."

Contrary to the majority's assertion, the testimony of defendant's manager is not to the contrary. Rather, the manager's testimony, taken out of context by the majority, was that the videotape for any given day is retained in a safe at the store. This testimony does not contradict the manager's own testimony, let alone the vice-president's sworn statement, that the videotapes are recycled after 30 days. Read as a whole, the manager's testimony conveys that the surveillance tapes are kept in a safe in the office of the store for 30 days and are then recycled in the ordinary course. Indeed,

5. Although my limited research has not found any case directly on point, it seems clear that the principle that the party opposing a CPLR 3211 or 3212 motion must get the benefit of every favorable inference should apply here as well. After all, granting motions for sanctions also takes issues of fact away from the jury. *Couri v Siebert* (48 AD3d 370 [2008]), cited by the majority, has nothing to do with this case. At most, it perhaps can be cited for the proposition that the court has discretion with respect to the appropriate sanction to impose when a party fails to comply with a discovery order. It certainly does not support the proposition that the court has discretion to determine whether the party in fact failed to comply with such an order or improperly destroyed evidence.

asked how long the videotapes are kept, the manager testified as follows: "Basically it's a basic program that runs for 30 days it keeps it on file." The majority gives this testimony the back of its hand, disregarding it on the basis of an argument that plaintiffs do not make, i.e., that this testimony applies only to uneventful days. Notably, the fact that plaintiffs do not make this argument is a point the majority does not dispute.

The majority misapprehends the "Yes" answer given by the manager when he was asked whether the videotape from the day of the accident was "kept for that day." Contrary to the majority's apparent position, that answer simply does not negate the manager's prior testimony or the vice-president's sworn statement that the tapes are recycled after 30 days. Notably, in their motion papers, plaintiffs never disputed the factual assertions that the tapes are recycled after 30 days.

The majority quotes a snippet of the manager's testimony in which he states, when asked where the video was from the day in question, "It has to be back in the store." This answer can be read to be at odds with the manager's prior testimony that the videotapes are recycled every 30 days. Of course, the manager may have meant only that the videotape that was used on the day in question was back in the store, not that it was back in the store in the same condition it was in when it was put into the safe on the day plaintiff fell. But despite the fact that plaintiffs bear the burden of proof and despite the majority's obligation to draw all reasonable inferences in favor of Modell's, the majority chooses to read the manager's answer to contradict the vice-president's affidavit. In any event, even if the answer could be read as unambiguously inconsistent with the manager's prior testimony, it would establish only an inconsistency between the testimony of the manager and the affidavit of the vice-president.[6] Presumably, the last two sentences above constitute or are a key part of what the majority regards as my

---

6. The majority goes on to note that plaintiffs' counsel demanded a copy of the video after the manager stated that "[i]t has to be back in the store." The majority then states as follows: "Had the tapes already been destroyed at that time, counsel for defendant could have so stated on the record." Obviously, however, that is true if and only if counsel knew at the time that they had been "destroyed." Not a shred of support in the record exists for the suggestion that he did, and plaintiffs have never argued or suggested that counsel knew, let alone that he tellingly failed so to state, when the manager was deposed. The majority sheds no light on why it makes this perplexing and insupportable statement.

"tortuous reasoning" that, along with other sins, "distorts the unambiguous testimony" of the manager.

Of course, the more fundamental point is that the vice-president unequivocally swore that, in accordance with routine practice, the videotape was recycled months before Modell's learned of a claim or lawsuit by plaintiffs. Nothing in the record comes close to conclusively refuting his sworn statements; nothing in the law comes close to permitting the majority to ignore those sworn statements.

The majority's efforts to justify disregarding the vice-president's sworn statements are manifestly inadequate. As this Court said in *Branham v Loews Orpheum Cinemas, Inc.* (31 AD3d 319, 324 [2006], *affd* 8 NY3d 931 [2007]), "[C]ourts have occasionally disregarded affidavits or other evidence submitted in opposition to [a motion for summary judgment] where they directly contradict the [party's] own version of the accident and are plainly tailored to avoid dismissal of the action." The majority cites one such case (*Capraro v Staten Is. Univ. Hosp.*, 245 AD2d 256 [1997]) and argues that the vice-president's affidavit "is nothing more than a last-minute attempt by defendant to tailor the facts and present a feigned factual issue to avoid the consequences of the [earlier] admission by manager Abreu . . . and is, thus, without probative value." Plaintiffs, however, do not cite any of these cases (several are cited in *Branham*), and that is unsurprising because they do not even argue that the vice-president's affidavit was so tailored and for that reason can be disregarded. The majority does not and cannot dispute that plaintiffs make no such argument.

Thus, this is an argument that the majority improperly "winkle[s] out wholly on [its] own" (*Misicki v Caradonna*, 12 NY3d 511, 519 [2009]), and it should be disregarded. Even though it does not dispute that plaintiffs do not make that argument, and it has no response to *Misicki v Caradonna*, the majority writes that I "conveniently disregard[ ]" the case law supporting this argument. In any event, the argument the majority has devised is unpersuasive. As discussed above, on the crucial issue of whether the videotape from the day of the accident had been recycled in the ordinary course or improperly "destroyed," there is nothing like an unequivocal contradiction between the vice-president's affidavit and the manager's testimony. To the contrary, they can be harmonized and, in the procedural posture

of this case, should be harmonized.[7] And even if there were an unequivocal contradiction, we can consider subsequent affidavits that correct an earlier version of the relevant facts (see e.g. Marcano, 13 AD3d at 110-111).

The majority asserts that the manager was in a better position than the vice-president to know the specific facts regarding the store's video recordings and the accident. (The majority inexplicably ignores testimony that at least undercuts this finding: the manager's testimony that he was "not 100 percent sure" whether the spot where plaintiff fell was covered by a surveillance camera). The majority's arguments in support of its conclusion that the manager was in a position superior to that of the vice-president are fatally flawed.

In the first place, its contention based on the status of the vice-president as a vice-president of a subsidiary of defendant improperly ambushes Modell's by minting yet another argument. The majority suggests, without a shred of record support, that for this reason he is less likely to have personal knowledge of the matters to which he swore. The majority also faults his two affidavits for not setting forth "any operational connection between [the subsidiary] and defendant corporation." Again, the critical point is that at no time have plaintiffs ever argued that the vice-president's position as an officer of the subsidiary was at all relevant, let alone that it provided a ground for disregarding his affidavit. Nor did plaintiffs ever argue that the vice-president's affidavit was defective because it did not detail his "connection" to Modell's. In short, the majority ambushes Modell's (see Misicki, 12 NY3d at 519 ["We are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made"]).

Second, in seeking to rebut this point, the majority unwittingly supports it with its quotation from the reply affirmation of plaintiffs' counsel. After all, the vice-president unquestionably is one of the two executives referred to by plaintiffs' own counsel as one of "defendant's . . . executives" (emphasis added). As is evident, far from arguing the relevance of the vice-president's status as an officer of the subsidiary, plaintiffs' counsel refers to him as an officer of Modell's (the same sin that, according to the majority, I com-

7. For this same reason, the majority's reliance on Lupinsky v Windham Constr. Corp. (293 AD2d 317 [2002]) also is misplaced. I note, too, that this is in any event another argument improperly winkled out by the majority.

mit). The improper and prejudicial character of the majority's argument based on that status is clear: Modell's had no opportunity to present any facts in response. For all the majority knows, plaintiffs knew that the facts would not support such an argument. Ironically, moreover, in their initial submissions in support of their motion, plaintiffs included the vice-president's first affidavit. Needless to say, they did not attack it on this ground. In any event, the decisive point is that this is yet another argument the majority impermissibly winkles out on its own (*Misicki*, 12 NY3d at 519).

The majority also asserts that the vice-president's affidavit is deficient because he does not have "actual personal knowledge of the facts" and does not state how he obtained the information contained in his affidavit. In addition, the majority characterizes the statements contained in the affidavit as "self-serving," a characterization that adds nothing to the analysis; any affidavit a party submits in support of its position can be so characterized. Here, the majority at least builds on an argument plaintiffs did make to the motion court. In his reply affirmation, plaintiffs' counsel referred to the "improper self-serving and speculative affidavits from defendant's . . . executives with no personal knowledge of the facts." Plaintiffs' counsel offered no factual basis for his assertion that the vice-president had no personal knowledge of the facts to which he swore.[8] Apparently, he regarded the absence of an express statement by the vice-president that he had personal knowledge to be conclusive proof that he did not; it appears, too, that the majority agrees. Neither plaintiffs nor the majority cite any precedent in support of that position.

The point need not be discussed, because plaintiffs' counsel ignored a crucial statement in the first affidavit by the vice-president in which he expressly swore: "I am fully familiar with the operations of this store, including the surveillance cameras located in certain parts of the store." This sworn statement cannot meaningfully be distinguished from an assertion of personal knowledge of the facts. As discussed below, the

8. The majority faults me for pointing out that plaintiffs' counsel offered no factual basis for that assertion. And it finds fault even though it relies on a case, *Adam v Cutner & Rathkopf* (238 AD2d 234 [1997]), that reiterates the familiar precept that such affirmations by a party's attorney are entitled to no weight. Suffice it to say the majority thus brings to mind Juvenal's jest that "[i]t is difficult not to write satire."

majority's effort to come to grips with this sworn statement is unpersuasive.[9]

The majority can wring no support for its position that the affidavit must be disregarded from the only case it does cite, *Adam v Cutner & Rathkopf* (238 AD2d 234 [1997], *supra*). That case is not remotely analogous to this one since it deals with affirmations or affidavits submitted by attorneys. Specifically, the plaintiffs, in support of their cross motion for summary judgment, submitted in relevant part only the affirmation of an attorney. Moreover, in his affirmation, the attorney did not provide any explanation of his relationship to the entity regarding which he made conclusory assertions of fact and the attorney neither stated the basis of his knowledge nor professed to have personal knowledge of the alleged facts.

By contrast, the affidavit in this case is not that of a party's attorney, someone who typically has no personal knowledge of the underlying facts, and is not an affidavit by someone whose "relationship to the [entity in question] is not revealed in the moving papers" (*id.* at 236). The vice-president's relationship to Modell's is explained in the affidavit. To be sure, it is not elaborated upon, but it is reasonable to infer that an officer of a business entity is knowledgeable about the entity's business and practices. That inference, coupled with the explanation of the vice-president's relationship to Modell's, is sufficient to refute the majority's position that the vice-president's affidavit is defective. In any event, however, as noted above, the vice-president swore to the fact that he is "fully familiar with the operations of this store, including the surveillance cameras located in certain parts of the store." The majority does not cite any authority in support of the proposition that he was required to say more. The one case the majority cites, *Peacock v Kalikow* (239 AD2d 188 [1997]), states only that to demonstrate a meritorious defense on a motion to vacate a default judgment, "a party must submit an affidavit from an individual with knowledge of the facts" and that the affidavit "must make sufficient factual allegations; it must do more than merely make conclusory allegations or vague assertion[s]" (*id.* at 190

---

**9.** Nor do plaintiffs come to grips with it. Rather, in their brief plaintiffs do little more than repeat the unsubstantiated assertion by their attorney that the vice-president has no personal knowledge of the facts to which he swore. Plaintiffs' only other effort to support their position is a citation to *Matott v Ward* (48 NY2d 455 [1979]), which is manifestly inapplicable since it deals with the "predicate for the admission of expert testimony" (*id.* at 459).

[internal quotation marks and citations omitted]). Thus, nothing in *Peacock v Kalikow* supports the majority's position that the vice-president's affidavit is "conclusory" or otherwise defective because he swore that he was "fully familiar with the operations of this store, including the surveillance cameras," rather than that he had "personal knowledge" of those operations. The sworn statement by the vice-president is no more conclusory than a statement by him that he "had personal knowledge of the operations of this store, including the surveillance cameras." If the former statement is conclusory because he does not explain how he became fully familiar, the latter is conclusory because he does not explain how he came to have personal knowledge.

Although the majority sweepingly asserts that it "is empowered to decide, sua sponte, that an affiant is without personal knowledge of the facts . . . by simply reviewing the substance of the affidavit," nothing in *Adam v Cutner & Rathkopf* provides the slightest bit of support for the power the majority claims. I respectfully submit that this Court does not have that extraordinary power and that, even if it did, nothing in the vice-president's affidavits warrants the conclusion that he does not have either personal knowledge of the store's practices and procedures concerning the retention of surveillance videos or another adequate basis for his factual assertions on those subjects.

The majority's efforts to distinguish *Marcano* are meritless. The majority first argues that *Marcano* is distinguishable in that "the motion court sua sponte sanctioned the defendant by precluding it from offering evidence at trial regarding the manner in which the plaintiff's accident occurred." The ostensible sua sponte character of the motion court's sanction order, however, played no role in this Court's reasoning. That is unsurprising because the trial court's order cannot reasonably be so characterized. Rather, as the decretal paragraph of this Court's order makes clear, the order under review granted the "plaintiff's motion . . . to sanction defendant for alleged spoliation of evidence . . . to the extent of precluding defendant from offering evidence at trial regarding the manner in which plaintiff's accident occurred, and to the further extent of resolving the issue of liability in favor of plaintiff" (13 AD3d at 110). The fact that order granted a lesser sanction than the one the plaintiff apparently sought does not mean that the order was issued sua sponte.

The majority goes on to argue that this Court "reversed on the ground that it is for the jury to determine whether the defendant's employee was credible when he testified that the videotape was erased because the camera did not cover the area of the plaintiff's accident and, if not, to determine the inference to be drawn." Whether this ground for reversal can be considered "procedural" is a matter I need not discuss. The critical point is that this Court held that the issue of whether the employee was credible should not have been taken from the jury. That is precisely my point with respect to defendant's vice-president here. Thus, this effort to distinguish *Marcano* founders because it assumes the correctness of the majority's other findings and arguments, most notably that: (1) the manager testified that the unrecycled tape from the day of the accident was in the store at the time of his deposition, and (2) the affidavit of the vice-president must be disregarded.

The majority then offers the following paragraph:

> "Here, the motion court directed that the trial court 'shall issue a negative inference charge' against defendant. A reading of the adverse inference charge simply shows that it is permissive (*Baez v City of New York*, 278 AD2d 83, 84 [2000]), and conflicting inferences as to whether a video surveillance camera recorded the incident are appropriately deferred for resolution by a jury upon suitable instruction. As noted in *Marcano*, the charge provides that the jury shall determine whether there was a reasonable explanation for the destruction of evidence and, if not, the inference to be drawn from its destruction (PJI 1:77.1; *Tawedros v St. Vincent's Hosp. of N.Y.*, 281 AD2d 184 [2001])."

True, the PJI charge is permissive in several respects. The jury is permitted to determine if the evidence in question was destroyed; if so, it is permitted to determine whether a reasonable explanation for its destruction was offered; and the jury is permitted, if it finds the evidence was destroyed and no such reasonable explanation was offered, either to come to various conclusions adverse to the party who destroyed the evidence or to ignore it altogether.

What the majority is saying in the above-quoted paragraph, however, is unclear. If the majority means to say that the jury in this case will be free to determine whether the videotape taken

on the day of the accident was recycled in the normal course long before Modell's had notice of plaintiffs' claim, it should say so. If that is all the motion court's order means, then Modell's has needlessly prosecuted and plaintiffs have needlessly defended this appeal. Indeed, in that case, it is hard to see how Modell's is even aggrieved by the order. The order simply declares undisputed legal principles.

But I very much doubt that that is what the majority means to say. After all, if that is what the majority means to say, its critical finding of fact—that the tapes were destroyed after plaintiffs' notice to produce was served and in "direct violation of the mandate of the court"—is wholly gratuitous. I am quite sure, moreover, that at trial plaintiffs will advance a very different reading of the paragraph and will contend that this Court has conclusively resolved this critical issue. Whatever the majority means to say in this paragraph, it should clarify it in fairness to the parties and the trial court, which will struggle to understand it. Unfortunately, the majority has nothing to say on the subject.

In sum, here, as in *Marcano*, "[t]he existing record presents a triable issue as to whether any spoliation of evidence actually occurred, and that issue should be submitted to the jury at trial" (13 AD3d at 110).

Finally, I note that plaintiffs' argument that the tape was destroyed in violation of instructions given by defendant's legal department is not supported by the testimony of defendant's manager.

ACOSTA, RENWICK and FREEDMAN, JJ., concur with TOM, J.P.; McGUIRE, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on or about November 2, 2009, affirmed, without costs.